

*1052228780*

# IN DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

1. LADONNA PARIS, an individual,  )
   )
   Plaintiff )
   )
v. )
   )
1. RONNI CARROCIA, an individual; )
   )
2. DAYLAN ROOT, an individual; )
   )
3. TY BURNS, an individual; )
   )
4. CITY OF TULSA, a municipal )
   corporation; )
   )
5. GEORGE THERON BYNUM IV, an )
   individual; )
   )
   )
   Defendants. )

DISTRICT COURT
**FILED**

MAY 1 0 2022

Case No.: _____

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

CJ-2022-01434

KELLY M. GREENOUGH

## COMPLAINT

COMES NOW the Plaintiff, Ms. LaDonna Paris, and, by and through her attorneys, Damario Solomon-Simmons and Kymberli J. M. Heckenkemper of SOLOMONSIMMONSLAW, PLLC, and J. Spencer Bryan and Steven J. Terrill of BRYAN & TERRILL LAW, PLLC, brings this action for damages against the Defendants, Ronni Carrocia, Daylan Root, Ty Burns, the City of Tulsa, and Mayor of the City of Tulsa George Theron ("G.T.") Bynum IV, for violations of her civil rights. In support of his Complaint, Plaintiff submits as follows:

### PARTIES, JURISDICTION & VENUE

1.  Plaintiff LaDonna Paris ("Ms. Paris") is an individual who resides in Tulsa County, State of Oklahoma.

2.  Ms. Paris is a 70-year-old great-grandmother and seminary student who suffers from late onset bipolar disorder.

1

EXHIBIT 1

3. Defendants Ronni Carrocia, Daylan Root, and Ty Burns are individuals who, upon information and belief, at all relevant times resided in Tulsa County, State of Oklahoma and who are or were officers employed by the Tulsa Police Department ("TPD") and acting under color of state law.

4. Defendant City of Tulsa is a municipal corporation and political subdivision of the State of Oklahoma located in Tulsa County, State of Oklahoma.

5. Defendant G.T. Bynum is the duly elected Mayor of the City of Tulsa and the final policymaker for the City with respect to operation of TPD, who at all relevant times has resided in Tulsa County, State of Oklahoma.

6. The Court has jurisdiction over the parties and the subject matter.

7. The events giving rise to this action occurred within the bounds of Tulsa County, State of Oklahoma.

8. Upon information and belief, all Defendants reside and/or conduct business within Tulsa County, Oklahoma, and the conduct of such business gave rise to the claims in this action.

9. Venue is proper in this Court pursuant to 12 O.S. §§ 133, 143.

## STATEMENT OF FACTS

10. Ms. Paris incorporates paragraphs 1 through 9 as if fully restated herein.

11. On or about October 25, 2021, Ms. Paris was at the Phillips Theological Seminary ("Phillips"), where she attends graduate school, when she began exhibiting signs of a mental health episode.

12. Witnesses at Phillips called 911, expressing concerns about Ms. Paris' mental state.

13. EMTs arrived on scene and observed Ms. Paris in a manic state.

14. As TPD officers were arriving on scene, Ms. Paris got into a motor vehicle and drove away.

15. After leaving the EMTs, Ms. Paris drove to ReStore Tulsa.

16. Defendants Carrocia and Root followed her.

17. In the midst of a bipolar manic episode, which included paranoia and delusions, Ms. Paris was afraid the officers were going to kill her, so she locked herself in the bathroom and would not come out.

18. Defendants Carrocia and Root escalated the situation, but before that, while Ms. Paris was locked in the bathroom rambling to herself incoherently, and, after Ms. Paris had persistently refused to come out of the bathroom for approximately 4 hours, Defendant Carrocia said, "At any point in time, we've gotta be ready for her to open that door and *we've gotta be ready to fight*."

19. Later in the encounter, Defendant Carrocia told Defendant Root, *"If she opens that door my hands are going on her immediately."*

20. Knowing Ms. Paris was experiencing a mental health episode, Defendants Carrocia and Root laughed hysterically as Defendant Carrocia escalated the situation by taunting Ms. Paris, jiggling the door handle and banging on and shaking the bathroom door.



21.    Ms. Paris, fully able to hear what Defendants Carrocia and Root were saying, asked, "You think this is funny? I'm not laughing. Why are you?"

22.    At one point, while Ms. Paris was still rambling, she said, "My God!", to which Defendant Carrocia responded, "My God!", in a mocking manner.

23.    Ms. Paris questioned why Defendant Carrocia was mocking her, saying, "That's not nice!"

24.    Multiple times, Defendant Carrocia threatened to tase Ms. Paris, even activating her taser to make it audible to Ms. Paris through the bathroom door, exclaiming, "You wanna get tased?!"

25.    At one point, Defendant Carrocia said, ***"You're gonna get pepper sprayed and it's gonna be a good time."***

26.    As Defendant Carrocia continued to taunt Ms. Paris, she laughed and said, ***"I love my job!"***



27.    Throughout the encounter, Defendant Carrocia laughed at Ms. Paris' mental state, gleefully stating, "She's so 85," which is a reference to a code TPD uses to signify a person in need of mental health treatment.

28.     After some time had passed with Ms. Paris still locked in the bathroom, Defendants Carrocia and Root discussed that another officer was en route to assist.

29.     Defendant Carrocia stated she hoped it would be a certain officer because she liked how he worked, hoping he would knock down the door and spray Ms. Paris.

30.     In the meantime, while Defendants Carrocia and Root were awaiting the arrival of the third officer, Defendant Carrocia threatened, *"I'm gonna kick this door down and rip you outta there."*

31.     She then said, *"It's simple for you to come out and it's gonna be a good time when you don't."*

32.     Defendant Carrocia also indicated that she planned to "throw [Ms. Paris] to the ground" once the officers were able to make entry.

33.     When the third officer, Defendant Burns, arrived to knock down the door, Defendant Carrocia stated, *"This is gonna be so fun!"*

34.     Defendant Burns knocked down the door, and the three TPD officers (collectively, "Defendant Officers"), slammed Ms. Paris to the ground without provocation, bloodying her face and chipping her tooth as Ms. Paris begged them to stop hurting her and prayed aloud, "The Lord is my shepherd, I shall not want."

35.     Ms. Paris did not actively resist arrest; in fact, while the Defendant Officers had her on the ground, Ms. Paris stated, "Okay. I'll go to jail. I don't mind."

36.     During the course of the arrest, Defendant Burns pulled down Ms. Paris' pants, exposing her buttocks, to seize a pack of cigarettes.

37.     It was readily apparent that the pack of cigarettes was not some sort of weapon that could pose a threat to the officers' safety before Defendant Burns even pulled down Ms. Paris' pants to expose it.

38.     After Defendant Burns pulled down Ms. Paris' pants, Defendant Carrocia grabbed the pack of cigarettes from Ms. Paris' buttocks.

39.     Once the Defendant Officers had Ms. Paris in custody, they took her outside.

40.     Defendant Carrocia told Ms. Paris to sit down, and before giving her a reasonable opportunity to do so, kicked her leg to force Ms. Paris to go to the ground.

41.     Defendant Carrocia then booked Ms. Paris into the Tulsa County Jail on multiple bogus felony charges, stating *"If you're gonna play stupid games, you're gonna win stupid prizes."*

42.     When Ms. Paris was booked into the jail—in a readily apparent manic state—she was placed in solitary confinement, where she remained without any treatment for her bipolar disorder for several days and possibly weeks.

43.     When Ms. Paris was being booked, someone, who upon information and belief, worked at the jail, asked Defendant Carrocia, "Do you want us to take her down to medical?", to which Defendant Carrocia responded, "Or they could just refuse it."

44.     Defendant Carrocia also omitted any reference to Ms. Paris' mental health condition in her incident report and arrest and booking data sheets.

45.     Ms. Paris was denied a court date for nearly one month and received no mental health treatment until she was finally transferred to Tulsa Behavioral Health on or about November 23, 2021.

46.     All Ms. Paris' charges were eventually dismissed by a Tulsa County district judge at the request of the state in the interest of justice.

## CLAIM # 1: UNREASONBALE SEIZURE/EXCESSIVE FORCE
### 42 U.S.C. § 1983 | Fourth/Fourteenth Amendments to the United States Constitution
### *Defendants Carrocia, Root & Burns*

47.     Ms. Paris incorporates paragraphs 1 through 46 and all statements made with respect to subsequently listed claims as if fully restated herein.

48.     The force the Defendant Officers used against Ms. Paris was objectively unreasonable under the circumstances.

49.     Ms. Paris is a petite, 70-year-old woman who, at the time, suffered from a torn meniscus.

50.     She was not armed, and the officers had no reason to believe she was.

51.     At one point, Defendant Root asked "*What if* she has a weapon in there?", hardly evidence of a reasonable suspicion that she was armed in fact.

52.     Ms. Paris was not reasonably suspected of having committed a violent crime.

53.     Ms. Paris was not fleeing; in fact, she was locked inside a bathroom where there was no way out other than the door that separated her from the Defendant Officers.

54.     Ms. Paris was not presenting an immediate threat of danger to the Defendant Officers or anyone else, as evidenced by the Defendant Officers' flippant attitude about what was happening.

55.     Ms. Paris was not actively resisting arrest, even after the Defendant Officers knocked the door down and immediately slammed her to the ground.

56.     Ms. Paris has no violent history, and the Defendant Officers had no reason to believe she did.

7

57.     Despite her mental condition, Ms. Paris was extraordinarily respectful to the Defendant Officers throughout the entire encounter.

58.     Still, three officers simultaneously slammed her to the ground, bloodying her face, chipping her tooth, injuring her finger, and exacerbating the injury to her leg.

59.     For the foregoing reasons, the Defendant Officers are liable to Ms. Paris for violating her Fourth Amendment right to be free of unreasonable seizure/excessive force.

### CLAIM # 2: DELIBERATE INDIFFERENCE TO MEDICAL NEED
### 42 U.S.C. § 1983 | Fourteenth Amendment to the United States Constitution
### *Defendants Carrocia & Root*

60.     Ms. Paris incorporates paragraphs 1 through 59 and all statements made with respect to subsequently listed claims as if fully restated herein.

61.     At the time the Defendant Officers taunted, laughed at, and used excessive force against Ms. Paris, they were well aware of the fact that she was suffering from a serious manic state.

62.     Still, once the Defendant Officers had Ms. Paris in custody, they did not seek mental health treatment for her.

63.     Instead, Defendant Carrocia booked Ms. Paris into the Tulsa County Jail, where she was placed in solitary confinement for approximately one week or more and denied mental health treatment for over a month until she was finally transferred to Tulsa Behavioral Health.

64.     Moreover, Defendant Carrocia omitted any reference to Ms. Paris' mental state in any of her reports, preventing the jail staff from having a complete understanding of Ms. Paris' medical condition.

65.     The Defendant Officers' knowledge of Ms. Paris' serious medical need, combined with their failure to seek any treatment for her, amount to deliberate indifference, and they are liable to Ms. Paris under 42 U.S.C. § 1983.

## CLAIM # 3: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 1983
### *Defendant City of Tulsa*

66.     Ms. Paris incorporates paragraphs 1 through 65 and all statements made with respect to subsequently listed claims as if fully restated herein.

67.     Ms. Paris suffers from bipolar disorder, which is a disability covered by the Americans with Disabilities Act ("ADA"), and was otherwise qualified to participate in or receive benefits of the City's services, programs, and/or activities.

68.     Ms. Paris was denied the benefits of the City's services, programs, and/or activities by reason of her disability, as the Defendant Officers failed to provide reasonable accommodations to Ms. Paris in the course of responding to the 911 call, despite knowing of Ms. Paris' disability.

69.     Specifically, the Defendant Officers, acting within the scope of their employment by Defendant City, a public entity, wrongfully arrested Ms. Paris despite knowing her behaviors were a result of her manic state, and who wrongfully and willfully withheld information from the receiving pretrial detention facility that was material to providing her with adequate care, all of which led to Ms. Paris being wrongfully incarcerated for more than a month.

70.     Additionally, in the course of the arrest, the Defendant Officers laughed at and mocked Ms. Paris specifically because of her disability, and the Defendant Officers as well as other officers on scene called her names like "bonkers" "basket case," "coocoo bird," "cray cray," and "douche bag," causing her to suffer greater indignity in the course of her arrest than other arrestees do.

9

71.     The Defendant Officers, who failed to provide reasonable accommodations to Ms. Paris and caused her to suffer greater indignity than other arrestees because of her disability, according to TPD, were acting pursuant to department policies.

72.     Plus, another officer who arrived on scene later, who appeared to be a supervisor, had no problem with the inhumane way the Defendant Officers were speaking about and to Ms. Paris.

73.     For the foregoing reasons, Defendant City is liable to Ms. Paris for the Defendant Officers' violations of her rights under Title II of the Americans with Disabilities Act.

### CLAIM # 4: VIOLATION OF THE EQUAL PROTECTION CLAUSE
### 42 U.S.C. § 1983 | Fourteenth Amendment to the United States Constitution
### *Defendants Carrocia & Root*

74.     Ms. Paris incorporates paragraphs 1 through 73 and all statements made with respect to subsequently listed claims as if fully restated herein.

75.     In the course of interacting with and arresting Ms. Paris, Defendants Carrocia and Root treated Ms. Paris with indignity, disrespect, and mockery.

76.     Specifically, Defendants Carrocia and Root laughed at and mocked Ms. Paris because of the behavioral manifestations of her disability.

77.     Moreover, Defendant Carrocia called Ms. Paris names like, "basket case," "bonkers," "coocoo bird," and "cray cray."

78.     Upon information and belief, Defendants Carrocia and Root have not treated other arrestees who were not experiencing mental health episodes this way.

79.     This disparate treatment bore no rational relation to any legitimate government objective.

80.     As a result of the disparate treatment Ms. Paris experienced at the hands of these officers, she suffered humiliation, fear, anger, and embarrassment, among other forms of emotional distress.

### CLAIM # 5: RATIFICATION OF VIOLATIONS OF MS. PARIS' CIVIL RIGHTS
### 42 U.S.C. § 1983
### *Defendants City of Tulsa & Bynum*

81.     Ms. Paris incorporates paragraphs 1 through 80 and all statements made with respect to subsequently listed claims as if fully restated herein.

82.     Upon information and belief, none of the Defendant Officers received any discipline for the misconduct they perpetrated against Ms. Paris.

83.     Written TPD Policy 136B prohibits officers from engaging in bias-based policing, which the department defines, in relevant part, as "disparate treatment of an individual solely on the basis of . . . disability . . . ."

84.     TPD Policy 136B also states "Officers will attempt to reduce perceptions, if any, of bias when detaining a citizen. When consistent with the safety of an officer or others and when reasonable, officers will . . . [b]e courteous, polite, and professional."

85.     TPD policy also specifically says, "Violations of this policy shall result in disciplinary action."

86.     In addition, TPD Policy 101A provides, "An officer shall use de-escalation techniques . . . consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force."

87.     Based on these policies, a formal complaint was filed against the Defendant Officers by Ms. Paris' son in November 2021.

88.     Despite the existence of these formally promulgated written policies, when body camera footage from the Defendant Officers' encounter with Ms. Paris went viral, TPD issued a formal statement condoning the sadistic actions of the Defendant Officers and stating, in relevant part, *"The overall actions of the Officers and the way in which the call was handled is within the policies of the Tulsa Police Department."*[1]

89.     The statement released by TPD described the entire incident in detail, justifying the Defendant Officers' actions and the reasons for them.

90.     The closest thing to criticism TPD's statement made of the Defendant Officers' actions was that their conversations about Ms. Paris—which the department falsely stated occurred outside of Ms. Paris' earshot[2]—"could be received as unprofessional."

91.     In addition to TPD's statement, Mayor of the City of Tulsa G.T. Bynum, who also viewed the body camera footage and who, pursuant to Title 29, Chapter 1, Section 101 of the City of Tulsa Municipal Code, is the final policymaker for TPD, stated about the incident, *"I am confident in the investigation conducted by the Tulsa Police Department."*

92.     The City of Tulsa through its final policymaker Defendant Bynum, did not discipline the officers, did not implement any new policies, and did not provide any new training. Accordingly, the failure of Defendant City and its final policymaker to act in response to this

---

[1] Tulsa Police Department Communications Unit Memo (Mar. 29, 2022) (filed herewith as **Exhibit 1**).

[2] It is notable that TPD claimed the discriminatory, harassing, and degrading statements by the Defendant Officers were out of Ms. Paris' earshot, when the stated basis for the arson charge filed against Ms. Paris was that the Defendant Officers could hear a lighter flickering through the door. If it is TPD's official position that Ms. Paris could not have heard what the Defendant Officers were saying, then the department should have disciplined and prosecuted Defendant Carrocia for making a false police report by stating she could hear something as faint as a lighter flickering from the same distance and with the same barrier in between the Defendant Officers and Ms. Paris as when the Defendant Officers were laughing at and mocking Ms. Paris prior to forcing entry into the bathroom. Upon information and belief, no such discipline or prosecution has occurred. Either TPD had no problem with its officers treating a citizen experiencing a mental health episode in such a degrading and dehumanizing way, or it had no problem with its officer engaging in malicious prosecution.

egregious conduct is sufficient for a jury to infer approval and agreement with the actions described above for which the City of Tulsa is liable.

## CLAIM # 6: DELIBERATELY INDIFFERENT
## POLICIES, CUSTOMS, TRAINING, AND SUPERVISION
## 42 U.S.C. § 1983
### *Defendant City of Tulsa*

93.    Ms. Paris incorporates paragraphs 1 through 92 as if fully restated herein.

94.    TPD is notorious for its customary use of excessive force, particularly against people who live with mental illnesses and Black and brown Tulsans, so much so that the Human Rights Watch, an *international* non-governmental organization dedicated to "investigat[ing] and report[ing] on abuses of human rights happening in all corners of the world,"[3] chose TPD to conduct a "case study of abusive, overly aggressive policing in the US."[4]

### Custom of Excessive Force

95.    In May 2000, following a vehicle pursuit, a man named Arthur Bradley exited the vehicle with his hands up and got on the ground, and TPD Officer Quentin Houck beat him, kicked him, and stomped him.

96.    A Tulsa County District Judge, Linda Morrissey, saw the video and referred it to TPD's Internal Affairs Unit. Houck was given a 2-day paid suspension.

97.    In another incident occurring in 2000, a Black woman named Clara Jackson and her young son were stopped by TPD officers who were reportedly looking for a white male. The officers beat Ms. Jackson, pepper-sprayed her, and handcuffed her, and when she said "I'm going to call the police," they responded, "We are the police."

---

[3] Human Rights Watch, *About Us*, HRW.org (last visited Apr. 8, 2022 11:35 A.M. C.S.T.), https://www.hrw.org/about/about-us.

[4] HUMAN RIGHTS WATCH, "GET ON THE GROUND!" (2019), available at https://www.hrw.org/sites/default/files/report_pdf/us0919_tulsa_web.pdf. s

98.     In 2008, an unarmed boy was walking past two TPD officers when one of the officers, without provocation, slammed him to the concrete and beat him, fracturing his eye and requiring corrective surgery.

99.     The boy sustained hearing and vision impairment as a result of the beating.

100.     In April 2009, unarmed Jerard Drew was running down the street, nearly nude, while experiencing a mental health episode.

101.     Multiple TPD officers restrained, beat, and pepper-sprayed him, handcuffed him, and then laid him on the ground face down.

102.     Mr. Drew lost consciousness and later died at the hospital as a result of his injuries.

103.     In March 2010, a man named Keith Kimmel filed a formal complaint with TPD's Internal Affairs department alleging that on one night when he was at a local bar, a fight broke out and TPD officers were called.

104.     When the officers responded, Mr. Kimmel, who does not appear to have been involved in the fight, was ordered by the officers to leave.

105.     When Mr. Kimmel refused to leave, citing the fact that someone inside had possession of his driver's license, the officers laughed as they handcuffed him, slammed him onto the hood of a car, and tried to shove him into a patrol car.

106.     When Mr. Kimmel could not fit inside the car due to his size, the officers dragged him on his stomach across the parking lot and stuffed him into a second vehicle and punched him in the groin without justification.

107.     Mr. Kimmel alleged that the officers threatened to "start 'dislocating joints'" if Mr. Kimmel would not sit still.

14

108.     When Mr. Kimmel cried in pain and told the officers they had better not break his hand, an officer "mention[ed] something to the effect of 'we are experts at putting people in their place without leaving marks, they train us on that[.]"[5]

109.     In August 2013, an unarmed man named Michael Ruble was running from a TPD officer on foot in a vehicle-pedestrian chase, when the officer used his vehicle to strike Mr. Ruble to end the chase.

110.     Although the officer lacked any reason to believe that Mr. Ruble was armed and dangerous, the officer used excessive force by running over Mr. Ruble with his car.

111.     In March 2014, Deandre Lloyd Armstrong-Starks was unarmed and visiting a home where a TPD was executing a search warrant.

112.     TPD officers shot him *in the back*, killing him.

113.     In November 2014, TPD officers were called to respond to a situation involving a severely depressed Army veteran named Nathan Boyd, who had been on the phone with the Veterans' Crisis Line.

114.     Upon arrival, the officers ordered Mr. Boyd out of his vehicle.

115.     To prevent the officers from mistakenly believing he was exiting the vehicle armed with any weapons, Mr. Boyd placed a gun on his dashboard for officers to see and to show that he was disarming himself.

116.     As Mr. Boyd began to place a second gun on the dashboard, one of the officers opened fire, striking Mr. Boyd in the neck.

---

[5] KEITH KIMMEL, FORMAL COMPLAINT TO TULSA POLICE DEPARTMENT INTERNAL AFFAIRS (Mar. 29, 2010), available at http://s3.amazonaws.com/content.newsok.com/documents/tulsa_iab_public.pdf.

117. At the time he was shot, Mr. Boyd was not suspected of having committed any crime, was not actively resisting, and did not make any furtive movements or threats, and the officers had no reason to believe he posed any threat of violence.

118. In April 2015, a man named John Van Fossen called TPD to have two people who were intimidating and threatening him removed from his home.

119. Without detaining or placing Mr. Van Fossen under arrest, the officers made unreasonable demands of him, making Mr. Van Fossen realize the officers held disdain for him.

120. As a result, Mr. Van Fossen, who had a defensive weapon in his back pocket, decided to carefully remove the weapon so the officers would not see him as a threat.

121. Van Fossen made no sudden movements and calmly, slowly, and in a deliberate fashion turned his back to the officers while he gradually withdrew the knife from his back pocket to place it on the table, all while facing away from the officers.

122. Without warning or justification, the officers drew their weapons and fired multiple rounds into Mr. Van Fossen from behind.

123. At the time of the shooting, Mr. Van Fossen was not suspected of having committed any crime, had not made any threatening movements or statements, and posed no immediate threat to the officers' safety.

124. In June 2016, an unarmed man, Ollie Brooks, was arrested by TPD officers in a hotel room for a jaywalking warrant.

125. During the arrest, the officers tased Mr. Brooks multiple times and pepper-sprayed him.

126. Mr. Brooks became unresponsive and later died at the hospital.

127.     On September 16, 2016, 40-year-old Terrence Crutcher, Sr., was shot and killed by then-Tulsa Police officer Betty Jo Shelby while he was unarmed and calmly walking away from Shelby with his hands in the air.

128.     Shelby later testified that she was acting in accordance with her training from TPD, and she was allowed to keep her job, though she later resigned.

129.     Defendant City agreed to pay Shelby's legal bills incurred in defending against a lawsuit filed by Mr. Crutcher's Estate.

130.     In November 2016, TPD officers were called to a hotel by the hotel manager, who falsely accused a couple of damaging hotel property.

131.     Several officers responded and knocked on the couple's door.

132.     When the husband opened the door, the officers immediately forced their way in and drew their guns, telling the couple to "Get down!"

133.     The couple complied, but the officers still used unnecessary and excessive force in detaining and handcuffing the couple.

134.     In February 2017, an unarmed man named Ira Wilkins was sitting in his parked car at a car dealership when TPD officers approached him and demanded that he turn off the radio and get out of his car.

135.     Mr. Wilkins complied.

136.     The officers then pushed Mr. Wilkins up against his car, grabbed his hands and placed him in handcuffs, and began frisking him, asking him to identify himself.

137.     When he briefly hesitated, one TPD officer yanked on the handcuffs and forcefully pushed Mr. Wilkins against the car.

138.     Mr. Wilkins questioned the officers about why they were using so much force against him, and one officer responded by threatening more harm while the other officers laughed.

139.     Mr. Wilkins began pleading with the officers to stop putting so much force on his wrists, saying they were breaking them.

140.     At that point, a voice from the officer's radio asked if the officer using force on Mr. Wilkins had spray, and when the officer answered affirmatively, the voice ordered the officer to spray Mr. Wilkins.

141.     Throughout the entire encounter, Mr. Wilkins was compliant, not resisting, and was handcuffed with three officers on him.

142.     In another 2017 incident, a man named Jack Morris was brutally assaulted by multiple TPD officers after he refused to allow them onto his property.

143.     He was "struck multiple times in the head" and sustained a broken arm,[6] although he was not actively resisting arrest.

144.     On Christmas Day in 2017, TPD officers responded to a call of a naked man acting erratically in public, running down the street with a gun.

145.     According to a lawsuit filed by the man's mother, the man, Jacob Craig, was experiencing a mental health episode when he was shot while running away from the TPD officer who shot him.

---

[6] Samantha Vicent, *Fedearl Judge Rules Tulsan's Excessive Force Case Against Police Can Continue*, TulsaWorld.com (Aug. 4, 2020), https://tulsaworld.com/news/local/crime-and-courts/federal-judge-rules-tulsans-excessive-force-case-against-police-can-continue/article_2ac3e0c5-bb87-5878-9c56-93a81ff2afe3.html#tncms-source=login.

146.    The lawsuit also alleges that the officer shot Mr. Craig again while he was lying on the ground bleeding with the gun several feet out of his reach, and that the second round of shots killed Mr. Craig.

147.    On August 24, 2018, police responded to a mental health call involving 25-year-old Joshua Harvey, who suffered from schizophrenia, bipolar disorder, and drug addiction.

148.    Mr. Harvey was unarmed and wearing only gym shorts.

149.    The four TPD officers who responded escalated the situation by chasing Joshua into a nearby bank.

150.    They subsequently tased Joshua a total of 27 times and then improperly restrained him on the ground, ultimately killing him.

151.    All four officers, as well as TPD Chief Wendell Franklin, testified the officers acted in accordance with their training from TPD.

152.    In October 2018, an unarmed man named Earnest Fields was approached by TPD officers who were responding to a call about a non-violent domestic dispute between Mr. Fields and his wife at a QuikTrip.

153.    Mr. Fields complied with all orders given to him by the officers, was not suspected of having committed any serious crime, was not posing any threat of harm to the officers or anyone else, was not attempting to flee, and was not resisting arrest.

154.    Still, the officers tackled him to the ground and placed him in a headlock.

155.    In October 2019, Oklahoma State Representative Regina Goodwin publicly called on police to "better police themselves," and pointed to two specific incidents in which TPD officers used unnecessary force.[7]

---

[7] Emory Bryan, Video, *State Rep. Expresses Concern Over Excessive Force by Tulsa Police*, NEWSON6.COM (Oct. 16, 2019 2:11 P.M.),

156. Rep. Goodwin advised that a woman was tackled by a TPD officer in January 2019 following a traffic stop for driving without headlights.

157. She noted that the woman, who had no previous criminal record, was later charged with assaulting the officer who tackled her.

158. Rep. Goodwin also articulated that in July 2019, a man was beaten by two TPD officers whose body cameras were not turned on.

159. In a study conducted by Police Scorecard, an organization that "calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies,"[8] it was found that Tulsa was "one of the top 5 cities in the United States for police shooting rates among cities with a population over 400,000."[9]

160. Tulsa was also found to be within the top 20 cities for use of "less lethal" force.[10]

161. "Tulsa's rate of using higher levels of use-of-force (firearm, taser, baton, stranglehold, OC spray, etc.) during arrests is higher than 92% of departments studied."[11]

162. One of the creators of the report resulting from the study, Sam Sinyangwe, noted that "Oklahoma is a huge outlier in terms of the level of police violence. At the state level,

---

https://www.newson6.com/story/5e35ba6bfcd8ef694720c74d/state-rep-expresses-concern-over-excessive-force-by-tulsa-police.

[8] Police Scorecard, *Police Scorecard Project Methodology*, POLICESCORECARD.ORG (last visited Apr. 12, 2022 3:11 P.M. C.S.T.), https://policescorecard.org/about.

[9] OK Justice Reform, *Wayward Cops & Excessive Force: Police Accountability in Oklahoma*, OKJUSTICEREFORM.ORG (Oct. 25, 2021), https://okjusticereform.org/2021/10/wayward-cops-excessive-force-police-accountability-in-oklahoma/.

[10] Police Scorecard, *Police Scorecard Project Methodology*, POLICESCORECARD.ORG (last visited Apr. 12, 2022 3:21 P.M. C.S.T.), https://policescorecard.org/findings#misconduct-investigations.

[11] Nate Morris, *One Year Later: Tulsans Still Waiting on Policing Reforms Promised Last June*, THEBLACKWALLSTREETTIMES.COM (Jun. 8, 2021), https://theblackwallsttimes.com/2021/06/08/one-year-later-tulsans-still-waiting-on-policing-reforms-promised-last-june/.

Oklahoma has the third-highest in the country . . . And Oklahoma City and Tulsa both have some of the highest in any city in the country."[12]

163.    Nevertheless, TPD "sustain[s] citizen allegations . . . at one of the lowest rates in the country."[13] From 2016 to 2020, only 2% of misconduct complaints filed against TPD officers were found to be sustained.[14]

164.    In spite of all this, TPD has failed to adequately train and supervise its officers to ensure they are only using force when the Constitution permits it.

### Custom of Maltreatment of Tulsans Living with Mental Illnesses

165.    No fewer than seven (7) TPD officers were involved in the arrest of Ms. Paris, and none of them had a problem with the degrading, humiliating, and cruel way in which the Defendant Officers were treating Ms. Paris, even though all of them were aware of the fact that she, at 70 years old, had no criminal history but was only experiencing a mental health episode.

166.    Beyond that, TPD also has a storied history of maltreatment of Tulsa residents living with mental illnesses.

167.    Several of the use-of-force incidents listed above involved individuals experiencing a mental health condition.

---

[12] Nate Morris, *One Year Later: Tulsans Still Waiting on Policing Reforms Promised Last June*, THEBLACKWALLSTREETTIMES.COM (Jun. 8, 2021), https://theblackwallsttimes.com/2021/06/08/one-year-later-tulsans-still-waiting-on-policing-reforms-promised-last-june/.

[13] OK Justice Reform, *Wayward Cops & Excessive Force: Police Accountability in Oklahoma*, OKJUSTICEREFORM.ORG (Oct. 25, 2021), https://okjusticereform.org/2021/10/wayward-cops-excessive-force-police-accountability-in-oklahoma/.

[14] Police Scorecard, *Police Scorecard Project Methodology*, POLICESCORECARD.ORG (last visited Apr. 12, 2022 3:21 P.M. C.S.T.), https://policescorecard.org/findings#misconduct-investigations.

168.     Additionally, because police officers' "training is more oriented towards command and control" officers who respond to mental health calls often escalate the situation, give orders in "rude and abusive" tones, and overall exacerbate the condition of the person in distress.[15]

169.     At a City Council meeting on March 30, 2022, the Council received public comments regarding the city's need for an Office of the Independent Monitor to oversee investigations into police misconduct and use of force.

170.     One woman, Vana Andrews, spoke about an incident where a man who was disabled from a prior head injury "was walking home from the store as he does every day and cut across the yard of a neighbor's house two doors down."

171.     She explained, "The owner yelled at him for trespassing. They called 911 and attempted to hold him down until police arrived. He tried to break free by pushing them, and the police drew guns and tasered him several times."

172.     She continued that the man was ultimately hospitalized.

173.     Another woman, Pamela Vest, who lives at Murdock Villa[16], noted that she "ha[s] terrible videos of how the police have treated me and other residents there."

174.     She continued that when she had a mental health crisis, "a police officer told me if he had to be called out on me again, he'd find a felony to arrest me for."

175.     Ms. Vest also stated that another time she was experiencing a mental health crisis and someone called the police, "I nailed my door shut . . . I opened my window and I told them to go away or I'm going to jump. I wasn't suicidal. I was afraid of the cops. I didn't want them to sit

---

[15] HUMAN RIGHTS WATCH, "GET ON THE GROUND!" 147, 148 (2019), available at https://www.hrw.org/sites/default/files/report_pdf/us0919_tulsa_web.pdf.

[16] Murdock Villa is a public housing property reserved for people living with disabilities. *See* https://www.tulsahousing.org/wp-content/uploads/2017/11/11-2-THA_Housing_MurdockVilla.pdf.

on me and crush me because I can't breathe as it is. They're going to kill me. I'm afraid of them as a mentally ill person that they're going to do to me what they've done to so many people."

176. Despite these incidents, Defendant City has failed to implement measures to protect Tulsans living with mental illnesses from excessive force and discrimination by TPD officers.

177. As City Council Chair Lori Decter-Wright pointed out in the March 30, 2022 City Council meeting, the Defendant Officers' conduct against Ms. Paris, which they knew was being recorded on their body cameras, evidences that TPD officers believe they can treat people with mental illnesses as subhuman with impunity:

> The most disturbing thing about this video, besides the disgusting abuse that any one of us could be subject to on our worst day, is that the officers knew they were being filmed and still behaved that way.
>
> [. . .]
>
> What we've been told time and time again is, 'We've got body cams so everyone can have multiple viewpoints and really see,' [and] 'Don't watch the edited one. Watch the full 5-angle, 60-minute playback.' We can watch that playback and still see an officer who was taking joy in taunting and torturing one of our own citizens on their worst day – knowing they were being filmed. ***That speaks to culture . . . That is practice.***

**Deliberately Indifferent Policies, Customs, Training, and Supervision**
**Regarding How Officers Handle Encounters with People Living with Mental Illnesses**

178. Tulsa has an "alarming" mental health problem, "where 1 in 7 people have a mental illness."[17]

---

[17] Corey Jones, *How Bad Is Mental Health in Tulsa? Study Portrays 'Alarming' Statistics But Offers Hope*, TULSAWORLD.COM (Updated Jan. 27, 2021), https://tulsaworld.com/news/local/how-bad-is-mental-health-in-tulsa-study-portrays-alarming-statistics-but-offers-hope/article_82ef1ff1-8301-5512-a742-e0fcb66471d2.html; *see also, e.g.* Kassie McClung, *As Number of Mental Health Transports Increases, Tulsa Police Try a New Approach*, READFRONTIER.COM (Aug. 24, 2017), https://www.readfrontier.org/stories/as-the-number-of-mental-health-transports-increases-tulsa-police-try-a-new-approach/.

179. According to one TPD officer, "it's not unusual for officers to spend their entire shifts in a hospital emergency room or a mental health facility like the Crisis Center waiting for the person they brought in to be evaluated. And that is after the officer has been in the field trying to evaluate the person's condition and whether he or she should go to jail or receive treatment."[18]

180. The Human Rights Watch reported, "In 2017, the Tulsa Police Department received over 13,000 calls involving people with mental health conditions," and quoted TPD Deputy Chief Brooks as saying "responding to people with mental health conditions is one of the most pressing concerns for the department."[19]

181. In 2017, a former Houston police officer who at the time served on the board for the National Alliance of Mental Health Tulsa observed, *"Now, we're sending the police out as a front-line mental health team with no training and no resources, and no support backup, and we expect them to do the job . . . ."*[20]

182. Sergeant Shellie Seibert, TPD's mental health coordinator, has "stressed the importance of learning to identify someone wo is symptomatic and being able to de-escalate the situation."[21]

---

[18] Kevin Canfield, *Watch Now: For Mental Health Concerns, Police Now Have a Safe Place to Take People for Care and Evaluation*, TULSAWORLD.COM (Jan. 22, 2022), https://tulsaworld.com/news/local/watch-now-for-mental-health-concerns-police-now-have-a-safe-place-to-take-people/article_228f05c6-3f2e-11eb-be5f-63ea0cdce3d0.html#tncms-source=login.

[19] HUMAN RIGHTS WATCH, "GET ON THE GROUND!" 146 (2019), available at https://www.hrw.org/sites/default/files/report_pdf/us0919_tulsa_web.pdf.

[20] RYAN GENTZLER, OKLAHOMA POLICY INSTITUTE, STRATEGIES FOR BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES IN OKLAHOMA 7 (Nov. 2017), https://okpolicy.org/wp-content/uploads/Strategies-for-Building-Trust-Between-Law-Enforcement-FINAL-1.pdf?x71268.

[21] Kyle Hinchey, *'This Is an Illness, Not a Crime': Mental Health Training Vital for Officers Handling Crisis Situations Like Joshua Barre*, TULSAWORLD.COM (Jun. 17, 2017), https://tulsaworld.com/news/local/crime-and-courts/this-is-an-illness-not-a-crime-mental-health-training-vital-for-officers-handling-crisis/article_0862dc11-325a-59e2-8268-8d495ec59065.html.

183.     Despite acknowledging, "The reality of policing today is that the women and men of our Police Department are the community's de facto mental health first responders,"[22] Defendant Bynum, the final policymaker for TPD, has deliberately refused to implement sufficient measures to ensure TPD is equipped to handle this widespread problem in a constitutional and otherwise lawful manner.

184.     In fact, some of the state's political leaders have stepped in, calling for more action to better prepare law enforcement to handle encounters with people experiencing mental health episodes. In May 2021, Senator Jim Inhofe announced he would be filing the "Law Enforcement Training for Mental Health Crisis Response Act of 2021," which would dedicate $7.5 million in grants to law enforcement "to response to crises and promote collaboration with medical and mental health professionals." In announcing this plan, Senator Inhofe noted, "What we want to make sure is that they are equipped with whatever is necessary to help them with this community [of people living with mental illnesses]. . . And they are not right now."[23]

185.     While TPD designates a few officers to participate in a multidisciplinary, multi-agency unit dedicated to responding to mental health calls called the Community Response Team ("CRT"), this token gesture is woefully inadequate to deal with the volume of mental health calls to which TPD officers are so frequently dispatched.

186.     In body camera footage of Ms. Paris' encounter with the Defendant Officers, the officers engaged in the following exchange:

        Defendant Root:     CRT sucks.

---

[22] Kevin Canfield, *Watch Now: For Mental Health Concerns, Police Now Have a Safe Place to Take People for Care and Evaluation*, TULSAWORLD.COM (Jan. 22, 2022), https://tulsaworld.com/news/local/watch-now-for-mental-health-concerns-police-now-have-a-safe-place-to-take-people/article_228f05c6-3f2e-11eb-be5f-63ea0cdce3d0.html#tncms-source=login.

[23] Whitney Bryen, *Inhofe Proposes $7.5M for Police Mental Health Training*, JOURNALRECORD.COM (May 17, 2021), https://journalrecord.com/2021/05/17/inhofe-proposes-7-5m-for-police-mental-health-training/.

Defendant Carrocia: Yeah, well they're the only ones to call. What are you gonna do? They're only 3 or 4 people or whatever, so I mean, if they're busy on a call, what are you gonna do? We need like 6 CRT teams to go around town.

187. Further, per the Human Rights Watch:

[T]he Community Response Teams . . . only operate two days a week and have limited capacity. Funding, beyond costs for designated Community Response Team officers, has not come from the city budget but depends on charitable contributions.[24]

188. Moreover, TPD does not always dispatch the few officers who possess voluntary advanced mental health training to mental health calls.[25]

189. During the Defendant Officers' encounter with Ms. Paris, a man asked the Defendant Officers if they "go to school for this," apparently referring to handling encounters with mentally ill persons, and Defendant Root responded, "Yep. This is exactly what we train for."

190. Defendant Carrocia, on the other hand, responded, "Yeah, but not like this!"

191. These responses suggest either that TPD trains its officers to handle encounters with Tulsans suffering from mental health crises by discriminating against them and mocking their disabilities, or that TPD does not train its officers on how to deal with situations in which mentally ill subjects are not cooperative as a result of their mental illnesses.

192. Either way, the training is constitutionally inadequate and deliberately indifferent in light of the city's mental illness epidemic and the frequency with which TPD officers come into contact with Tulsans experiencing mental health episodes.

---

[24] HUMAN RIGHTS WATCH, "GET ON THE GROUND!" 149 (2019), available at https://www.hrw.org/sites/default/files/report_pdf/us0919_tulsa_web.pdf.

[25] Kyle Hinchey, 'This Is an Illness, Not a Crime': Mental Health Training Vital for Officers Handling Crisis Situations Like Joshua Barre, TULSAWORLD.COM (Jun. 17, 2017), https://tulsaworld.com/news/local/crime-and-courts/this-is-an-illness-not-a-crime-mental-health-training-vital-for-officers-handling-crisis/article_0862dc11-325a-59e2-8268-8d495ec59065.html.

193. The discrimination against and failure to provide reasonable accommodations for an individual living with a mental illness was a highly probable and even inevitable consequence of TPD's failure to adequately train its officers on how to properly treat persons living with mental illnesses.

194. Defendant City's policymakers knew that their failure to dedicate adequate resources to respond to the high volume of mental health calls TPD officers face would inevitably result in a TPD officer violating the civil rights of Tulsans living with mental illness with whom TPD officers come into contact, and yet the City refuses to adequately address the issue, choosing instead to allow the state of nature to control.

195. The City and its policymakers' failure to dedicate adequate resources to respond to the high volume of mental health calls, in light of this knowledge, amounts to deliberate indifference to the civil rights of those with whom TPD officers come into contact.

## CLAIM # 7: SUPERVISORY LIABILITY
## 42 U.S.C. § 1983
### *Defendant Bynum*

196. Ms. Paris incorporates paragraphs 1 through 195 and all statements made with respect to subsequently listed claims as if fully restated herein.

197. Defendant Bynum is liable to Ms. Paris for the Defendant Officers' violations of her civil rights due to his personal involvement and responsibility to adopt, enact, ratify, enforce, and maintain the policies and practices that caused the injuries and damages to Ms. Paris.

198. Specifically, because of prior incidents of excessive use of force and overly aggressive policing by TPD officers, Defendant Bynum knew those incidents would continue without imposing greater accountability measures within TPD's ranks.

199.     Following receipt of various reports confirming the existence of bias-based policing within TPD and after receiving extensive comments from community members impacted by TPD's overly aggressive and biased policing, as well as comments from researchers and experts in the field of law enforcement and bias over the last several years, Defendant Bynum has failed to implement adequate measures to ensure greater accountability within TPD.

200.     Defendant Bynum's continued lack of accountability, combined with the knowledge that City leaders are aware of TPD's pattern of overly aggressive and biased policing, gives TPD officers the impression that they are free to violate the civil rights of Tulsa residents with impunity.

201.     This attitude, as pointed out by Councilor Decter-Wright, is evidenced by the fact that TPD officers engage in such abhorrent and unlawful, unconstitutional conduct, despite knowing that the entirety of those actions are being filmed and can be viewed by supervisors at any time.

202.     Defendant Bynum's deliberate refusal to do more to ensure officers who violate people's rights are held accountable was the moving force behind the violations of Ms. Paris' rights.

203.     As such, Defendant Bynum is individually liable to Ms. Paris for the damages she sustained as a result of those violations.

## CLAIMS # 8-9: MALICIOUS PROSECUTION
### 42 U.S.C. § 1983 | Fourth & Fourteenth Amendments to the United States Constitution & Oklahoma Common Law
#### *Defendant Carrocia*

204.     Ms. Paris incorporates paragraphs 1 through 203 and all statements made with respect to subsequently listed claims as if fully restated herein.

205. Defendant Carrocia arrested Ms. Paris and booked her into the Tulsa County Jail on charges of trespassing, attempted arson in the fourth degree, threatening a violent act, resisting arrest, assault and battery on a police officer, and cruelty to animals.

206. Charges were filed in the Tulsa County District Court on October 28, 2021.

207. Ms. Paris, 70 years old, had never been charged with a crime before at any point throughout her entire life.

208. Body camera footage of the encounter between Ms. Paris and the Defendant Officers makes clear that Defendant Carrocia's motive was anything but "to bring an offender to justice."

209. Rather, the footage shows that Defendant Carrocia was annoyed by Ms. Paris' mental condition and that she was punishing her for it.

210. The footage demonstrates that Defendant Carrocia willfully incarcerated Ms. Paris with as many offenses as she believed she may be able to get away with by submitting a false and/or exaggerated police report and did so in an oppressive manner, with ill will toward Ms. Paris, and in conscious disregard of Ms. Paris' rights.

211. Additionally, if Defendant Carrocia's true desire was to bring Ms. Paris to justice, then she would have indicated Ms. Paris' mental state in the reports she submitted in support of the charges so that all the relevant facts concerning Ms. Paris' mental state and intent could be considered.

212. Instead, Defendant Carrocia omitted any reference of Ms. Paris' mental condition from her report, despite the fact that she was well aware of the fact that Ms. Paris had been experiencing a mental health episode.

213. Additionally, Defendant Carrocia lacked probable cause to charge Ms. Paris for attempted arson and animal cruelty.

214. Under Oklahoma law, specifically Okla. Stat. tit. 21, § 1404(A), the elements the State is required to prove to convict a person of arson in the fourth degree are as follows:

No person may be convicted of arson in the fourth degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, a willful and malicious;

Second, attempt to (set fire to)/burn/(destroy in whole or in part by the use of any explosive device or substance);

Third, (any building/structure)/(the contents of any (building/structure)/(any property that is insured)/(any real/personal property valued at $50 or more);

Fourth, made/aided/counseled/procured by the defendant.

See OUJI (Criminal) 5-8.

215. The Oklahoma Uniform Jury Instructions (Criminal) define "malice" in the context of arson as "A wish to vex, annoy or injure." OUJI (Criminal) 5-10.

216. Looking at the totality of the circumstances, the actions of Ms. Paris did not evidence a wish to vex, annoy, or injure anyone.

217. Rather, Defendant Carrocia was taunting and harassing Ms. Paris while escalating the situation by unnecessarily banging on the door, knowing it was scaring Ms. Paris; in response, Ms. Paris, experiencing paranoia as a symptom of her manic state, used the aerosol spray as an attempt to fend off the Defendant Officers, who she genuinely believed presented a threat to her life, while she persistently exclaimed, "Get away from me!"

218. In fact, when Defendant Carrocia accused Ms. Paris of trying to set the building on fire, Ms. Paris responded that she was not and instead that, "I am trying to save my life."

219. With respect to the animal cruelty charge, the relevant criminal statute reads:

30

Any person who shall willfully or maliciously . . . deprive any such animal of necessary food, drink, shelter, or veterinary care to prevent suffering; or who shall cause, procure or permit any such animal to be . . . deprived of necessary food, drink, shelter, or veterinary care to prevent suffering . . . shall be guilty of a felony . . . .

Okla. Stat. tit. 21, § 1685.

220.     The basis Defendant Carrocia gave for arresting Ms. Paris for animal cruelty was:

Ladona [sic] had also left her dog in her vehicle parked out front of the business for multiple hours without food or water. The windows were also not rolled down or cracked for air to come into the vehicle. Once the dog was removed from the vehicle it was extremely thirsty and hungry. Ladona [sic] has not been taking care of this animal.

221.     First, there was absolutely no evidence that Ms. Paris purposely, much less maliciously, deprived her beloved dog, Cocoa, of food or drink.

222.     In fact, Defendant Carrocia's body camera footage demonstrates that Ms. Paris believed the Defendant Officers had killed Cocoa and that they were now trying to kill her.

223.     Moreover, throughout Ms. Paris' encounter with the Defendant Officers, Ms. Paris asked where Cocoa was multiple times.

224.     It was apparent from Ms. Paris' statements that she had no idea she had even left Cocoa in the car.

225.     Even if there was any evidence that Ms. Paris meant to deprive Cocoa of food or water, Defendant Carrocia still would have lacked probable cause to arrest Ms. Paris for the crime of cruelty to animals.[26]

---

[26] Ironically, after Defendant Carrocia had already decided to arrest Ms. Paris for animal cruelty for depriving Cocoa of food and water, *she herself denied Ms. Paris water* as a *punitive* measure while Ms. Paris was in *her* custody. Ms. Paris asked for water over and over again, and Defendant Carrocia refused each time, noting that the officers would have helped Ms. Paris if she had just listened to them. As Ms. Paris continued begging for water while she persistently apologized to the Defendant Officers, Defendant Carrocia responded, "No, you tried to set us on fire in there." Still, after Defendant Carrocia refused to give Ms. Paris water, she told Defendant Root that what she was really mad about was what Ms. Paris had done to the dog. When Ms. Paris again asked for water several minutes later, Defendant Carrocia told another

226. Defendant Carrocia's body camera footage shows that when Cocoa was let out of the car, she was not emaciated, but was clearly well fed, groomed, and taken care of.

227. Cocoa was energetic, friendly, and appeared to be in normal health.

228. Further, Cocoa was locked inside a car alone without food or water for a maximum of five hours.

229. Many pet owners kennel train their pets and keep them caged without access to food or water for a full 8-hour workday or even overnight, all while managing to keep their pets healthy and sufficiently nurtured and hydrated.

230. If what Ms. Paris did with Cocoa were to be considered criminal, then virtually half of Oklahoma would be guilty of felonious animal cruelty for engaging in the most basic and common acts of pet ownership.

231. There is simply no law in Oklahoma that requires pet owners to ensure their pets have uninhibited 24-hour access to food and water.

232. In fact, such uninhibited and unrestricted access can, in some cases, pose more of a threat to a dog's health, as it can lead to obesity-related complications, overhydration, and urinary tract infections, depending on the dog and its particular needs.

233. Both of these charges were ultimately dismissed in the interests of justice.

234. As a result of this malicious prosecution, Ms. Paris was forced to stay a month in jail without medical or mental health treatment, some of which was served under solitary confinement.

---

officer who arrived to transport Ms. Paris to jail, "No, she's not getting any water. She tried to set us on fire."

235.    As a result of this wrongful incarceration, Ms. Paris experienced physical pain, emotional distress, and economic damages.

## CLAIM # 10: FALSE LIGHT
### Oklahoma Common Law
#### *Defendant Carrocia*

236.    Ms. Paris incorporates paragraphs 1 through 235 and all statements made with respect to subsequently listed claims as if fully restated herein.

237.    In Defendant Carrocia's police report, she stated, "Officers told her to stop trying to set the bathroom and officers on fire. The subject refused."

238.    Defendant Carrocia omitted both any reference to Ms. Paris' mental state and any indication that Ms. Paris expressly denied trying to set anything on fire and clarified she was only defending herself.

239.    The way Defendant Carrocia worded her report gave rise to the implication that Ms. Paris tacitly admitted to trying to set the building and officers on fire, which was utterly false.

240.    Likewise, Defendant Carrocia's body camera footage captured multiple conversations with other people wherein she indicated that Ms. Paris tried to set the building on fire and tried to kill the police, which Defendant Carrocia knew were false statements.

241.    Defendant Carrocia also falsely stated in her report that Ms. Paris "has not been taking care of this animal," referring to Ms. Paris' beloved chocolate Labrador, Cocoa, of whom Ms. Paris has consistently provided sustenance, shelter, and love.

242.    Moreover, Defendant Carrocia wrote in her report that Ms. Paris grabbed the hand of one of the officers, "causing pain."

243.    However, body camera footage shows no evidence of that; in fact, the officer to whom Ms. Paris allegedly "caused pain" to (Officer Shanks) flippantly said Defendant Carrocia

could "tack that on," (evidently referring to the charge of assault and battery on an officer) because Ms. Paris was a "douche bag," to which Defendant Carrocia gleefully responded, "All right! Perfect! Let's do it!"

244.     Officer Shanks never told Defendant Carrocia Ms. Paris caused her any pain, nor did she yelp or indicate pain in any other nonverbal manner.

245.     These exaggerations and false statements by Defendant Carrocia placed Ms. Paris in a false light to the public—namely, making her out to be a violent criminal and animal abuser, when, in reality, she has no criminal history, is a loving dog owner, and was only manifesting symptoms of her disability, about which Defendant Carrocia was well aware.

246.     As a result of these false statements, Ms. Paris was criminally prosecuted and made to endure a month's long jail stay, some of which was served in solitary confinement, without adequate medical or mental health care, which caused her to suffer physical pain, emotional distress, and economic damages.

### CLAIM # 11: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### Oklahoma Common Law
#### *Defendant Carrocia*

247.     Ms. Paris incorporates paragraphs 1 through 246 and all statements made with respect to subsequently listed claims as if fully restated herein.

248.     Despite knowing Ms. Paris was suffering a mental health episode, Defendant Carrocia taunted, harassed, mocked, and provoked Ms. Paris, and even told her beloved dog, Cocoa, in Ms. Paris' presence that she would be getting a "better home."

249.     This unnecessarily cruel and abhorrent conduct was extreme and outrageous, going beyond all possible bounds of decency and was utterly intolerable in a civilized society.

250. Defendant Carrocia intentionally engaged in this extreme and outrageous behavior with the purpose of causing Ms. Paris to suffer fright, fear, horror, worry, and humiliation beyond that which she was already suffering as a result of her manic state.

251. As a result of Defendant Carrocia's conduct, Ms. Paris suffered more severe emotional distress than that which any reasonable person should be expected to endure, particularly at the hands of someone whose job is to protect and serve their community.

252. Defendant Carrocia's intentional infliction of emotional distress perpetrated against Ms. Paris was, as a matter of law, outside the scope of her employment (as defined by the Oklahoma Governmental Tort Claims Act ("GTCA"), Okla. Stat. tit. 51, 151, *et seq.*).

### CLAIM # 12: ASSAULT
### Oklahoma Common Law
### *Defendant Carrocia*

253. Ms. Paris incorporates paragraphs 1 through 252 and all statements made with respect to subsequently listed claims as if fully restated herein.

254. While Ms. Paris was locked in the bathroom fearing for her life, Defendant Carrocia activated her taser, yelling, "You wanna get tased?!"

255. By communicating this threat and activating her taser so that the sound was audible to Ms. Paris, Defendant Carrocia intentionally put Ms. Paris in apprehension of being tased and caused her to suffer fright and terror.

256. Defendant Carrocia's assault against Ms. Paris was perpetrated in bad faith and therefore was outside the scope of her employment under the GTCA.

257. As such, Defendant Carrocia is liable to Ms. Paris for the emotional distress she suffered as a result of this civil assault.

## CLAIM # 13: UNREASONABLE SEARCH
### 42 U.S.C. § 1983 | Fourth/Fourteenth Amendments to the United States Constitution
### *Defendants Carrocia & Burns*

258. Ms. Paris incorporates paragraphs 1 through 257 and all statements made with respect to subsequently listed claims as if fully restated herein.

259. Defendant Burns' pulling down Ms. Paris' pants to retrieve a pack of cigarettes from her exposed buttocks while she was handcuffed on the ground amounted to an unreasonable strip search.

260. The strip search was conducted by a male officer in the presence of two other officers.

261. The strip search was conducted with no warning to Ms. Paris whatsoever.

262. There was no concern regarding the officers' safety, because Ms. Paris was handcuffed and it was already apparent that what was in Ms. Paris' pants was not a weapon.

263. The intrusion into Ms. Paris' privacy was severe; the search was performed by officers who she believed posed a threat to her life, and it occurred while she was in the midst of a mental health episode and being held on the ground by three strangers.

264. There was no reason to justify performing the search in the place and manner and at the time it was performed, when the lack of any safety concern would have permitted waiting until a female officer could perform the search in a private area away from male officers after warning Ms. Paris about what was about to occur.

265. In fact, the officers should have given Ms. Paris an opportunity to retrieve the cigarettes herself, considering that it was clear the pack of cigarettes was not a weapon of any kind.

266. This unreasonable strip search further demonstrates the Defendant Officers' utter lack of respect and dignity for Ms. Paris as a person living with a mental illness.

267. As a result of this unreasonable strip search, Ms. Paris suffered emotional distress.

## CLAIM # 14: INTERFERENCE WITH CONTRACT
### Oklahoma Common Law
#### *Defendants Carrocia & Root*

268. Ms. Paris incorporates paragraphs 1 through 267 as if fully restated herein.

269. When Ms. Paris was arrested for manifestations of her disability, Defendants Carrocia and Root knew or should have known that Ms. Paris had entered into a contract with U-Haul for the rental of a van.

270. This is evidenced by the fact that they knew Ms. Paris had been driving the U-Haul and they retrieved Ms. Paris' dog, Cocoa, from the vehicle at the time of Ms. Paris' arrest.

271. Upon information and belief, the contract Ms. Paris had with U-Haul delegated responsibility of the security of the van to Ms. Paris while it was in her possession.

272. When Ms. Paris was transported to jail, Defendants Root and Carrocia, knowing Ms. Paris would be unable to ensure the security of the U-Haul once she was in custody, intentionally left the keys to the U-Haul inside of the vehicle and left it unlocked in a commercial parking lot.

273. Defendants' Carrocia's and Root's actions were done in bad faith and motivated by contempt for Ms. Paris and a desire to punish her for behavioral manifestations of her disability.

274. By leaving an unlocked vehicle in an unrestricted commercial parking lot with the keys visibly inside of it, it was substantially certain that the vehicle would be stolen, which would have interfered with Ms. Paris' contract with U-Haul.

275. As a result of these Defendants' conduct, the U-Haul van was stolen, causing Ms. Paris to suffer economic damages.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court enter judgement in Plaintiff's favor and against the Defendants and award Plaintiff the following:

1.      All actual damages, including, but not limited to, pain and suffering, mental anguish, emotional distress, and loss of consortium/companionship, in excess of $75,000.00;

2.      Punitive damages to the extent authorized by law;

3.      Attorney fees and costs in accordance with 42 U.S.C. § 1988(b); and

4.      Any other and further relief the Court may deem just and equitable under the circumstances.

Respectfully submitted,


Damario Solomon-Simmons, OBA No. 20340
Kymberli J.M. Heckenkemper, OBA No. 33524
**SOLOMONSIMMONSLAW, PLLC**
601 S. Boulder Ave., Ste. 600
Tulsa, Oklahoma 74119
Phone: (918) 551-8999
Fax:    (918) 558-8039
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com
           *- and -*

J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA # 20869
**BRYAN & TERRILL LAW, PLLC**
3015 E. Skelly Dr., Ste. 400
Tulsa, Oklahoma 74105
Phone: (918) 935-2777
Fax:    (918) 935-2778
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

*Attorneys for Plaintiff*

38