## IN THE UNITED STATES DISTRICT COURT IN AND FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  LADONNA PARIS, an individual, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Case No.: 4:22-cv-00235-TCK-JFJ |
| | ) | |
| 1.  RONNI CARROCIA, an individual, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE & BRIEF IN OPPOSITION TO DEFENDANT RONNI CARROCIA'S PARTIAL MOTION TO DISMISS

COMES NOW the Plaintiff, Ms. LaDonna Paris, and, by and through her attorneys, Damario Solomon-Simmons and Kymberli J. M. Heckenkemper of SOLOMONSIMMONSLAW, PLLC, and J. Spencer Bryan and Steven J. Terrill of BRYAN & TERRILL LAW, PLLC, hereby submits this Response & Brief in Opposition to Defendant Ronni Carrocia's Partial Motion to Dismiss [Doc. 19]. Conceding that her claim for false light must be dismissed, Ms. Paris submits the following in opposition to the rest of Defendant Carrocia's partial motion to dismiss:

### INTRODUCTION

On October 25, 2021, Ms. Paris—a 70-year-old great grandmother, seminary student, and pillar of her community with no criminal history whatsoever—was suffering from a mental health crisis (a manic episode precipitated by her late onset bipolar disorder) at Phillips Theological Seminary, where she attended graduate school, when her colleagues called 911 out of concern for her mental health. [Pet., ¶¶ 2, 11, 12]. Experiencing paranoia and delusions, Ms. Paris left the scene to go to ReStore Tulsa and locked herself in a bathroom to protect herself from the police—who she believed had killed her dog, Cocoa, and were trying to kill her—and refused to come out. [Pet., ¶¶ 14-17]. Employees at ReStore Tulsa called the police, seeking to have Ms. Paris removed from

the premises since she would not leave on her own accord. Tulsa Police Department ("TPD") Officers Ronni Carrocia and Daylan Root were dispatched to handle the call. [Pet., ¶ 16]. Upon arrival, the officers discussed amongst themselves that Ms. Paris was "85"—an official code used by TPD to signify a person in need of mental health treatment. [Pet., ¶ 27]. Despite knowing Ms. Paris was in the throws of a mental health crisis, Defendant Carrocia, standing mere feet from Ms. Paris on the other side of the door of the bathroom in which Ms. Paris had locked herself, laughed as she mocked, intentionally frightened, threatened, and taunted Ms. Paris because of her mental disability. [Pet., ¶¶ 18, 20, 22, 24-26]. From the moment she arrived on the scene until the moment she booked Ms. Paris into jail (on a multitude of bogus felony charges) [Pet., ¶ 41], Defendant Carrocia harassed, mocked, taunted, ridiculed, threatened, laughed at, and berated Ms. Paris because of her manic state, even calling her things like "bonkers," "basket case," "coocoo bird," "cray cray," and "douche bag," for behavior that amounted to manifestations of Ms. Paris' disability. [Pet., ¶¶ 18, 20, 22, 24-26, 30-31, 33, 70, 75-77, 248].

Because of the bogus charges on which she was booked into jail by Defendant Carrocia, Ms. Paris spent over a month incarcerated, some of which was served in solitary confinement, and gravely inadequate, if any, mental health treatment. [Pet., ¶ 41-45]. After Ms. Paris' son filed a formal complaint with TPD over the way Defendant Carrocia and the other officers on the scene treated his mother, all charges against Ms. Paris were dismissed at the request of the state and in the interests of justice. [Pet., ¶ 46].

Ms. Paris filed this lawsuit in the Tulsa County District Court on May 10, 2022, seeking compensation for the physical pain, emotional distress, and economic damages she endured at the hands of Defendant Carrocia and others. After the case was removed to this Court by Defendant City of Tulsa, Defendant Carrocia filed the instant partial motion to dismiss, arguing Ms. Paris has

failed to state claims for false light, violation of the Equal Protection Clause, intentional infliction of emotional distress, and assault. Ms. Paris concedes her false light claim should be dismissed but submits that her Petition was more than sufficient to state the other claims Defendant Carrocia's motion addresses. The Court should deny the motion as to these.

## ARGUMENTS & AUTHORITIES

In her motion, Defendant Carrocia brazenly argues, in effect, that her abhorrent conduct during her encounter with Ms. Paris—which drew substantial public ire and singlehandedly reignited calls for greater scrutiny of TPD officers' encounters with members of the Tulsa community—was just not all that big of a deal. She argues that because her abuse was merely verbal, and, with respect to the assault claim, because a door separated her from Ms. Paris, her conduct is not actionable.

Ms. Paris disagrees, and so should the Court. The allegations regarding the reprehensible conduct Defendant Carrocia subjected Ms. Paris to during the encounter giving rise to this action are more than sufficient to state claims for intentional infliction of emotional distress and violation of Ms. Paris' rights under the Equal Protection Clause, because of the indefensible nature of the conduct and the fact that it caused Ms. Paris to suffer disparate treatment in the course of the encounter because of her disability, when other, non-disabled arrestees were not treated in a similar fashion. Furthermore, the allegations comprising her assault claim are adequate to show she reasonably apprehended an immediate harmful contact with her person by Defendant Carrocia and her taser. Plaintiff's allegations are more than sufficient to meet the "plausibility" standard of pleading in federal court, so the Court should deny Defendant Carrocia's motion.

## I.   PLAINTIFF HAS STATED AN EQUAL PROTECTION CLAIM BECAUSE HER CLAIM IS FOR DISPARATE TREATMENT, NOT MERE VERBAL ABUSE.

Ms. Paris' equal protection claim must not be dismissed, because the cases cited by Defendant Carrocia in support of her argument that verbal abuse cannot form the basis of a constitutional violation do **not** deal with equal protection claims, and Ms. Paris' claim is not founded upon mere verbal abuse, but disparate treatment.

Importantly, Ms. Paris is not claiming that Defendant Carrocia violated her rights by verbally abusing her; she is claiming that Defendant Carrocia violated her rights by treating her differently from similarly situated arrestees who do not suffer from disabilities. The *type* of treatment she received is not a relevant factor. Fundamentally, the Equal Protection Clause protects people from discrimination and arbitrary application and enforcement of the law, not from any particular type of treatment. Thus, if Ms. Paris had merely alleged that her rights were violated because she was verbally abused, her claim would be subject to dismissal, but Ms. Paris has alleged more than that: she has alleged that she was verbally abused *on the basis of her disability* and that similarly situated arrestees who *do not have disabilities* have not been subjected to the same verbal abuse during their arrests. To analogize, a disabled plaintiff in the employment discrimination context does not sue because his employer did not give him a job; he sues because his employer gave the job to an able-bodied person instead *because of his disability*. The distinction, though perhaps slight, is critical.

In the context of claims based on other constitutional provisions, distinguishing verbal abuse from other types of mistreatment arguably makes sense.[1] For example, if a police officer

---

[1] Importantly, the cases cited by Defendant Carrocia in support of her argument that verbal abuse cannot form the basis of a constitutional violations are cases decided in the context of other constitutional provisions, not the Equal Protection Clause. *See Prejean v. Corr. Healthcare Companies, Inc.*, No. 13-CV-111-JED-FHM, 2015 WL 711694, at *3 (N.D. Okla. Feb. 18, 2015) (Eighth Amendment); see also *McBride v. Deer*, 240 F.3d 1281 (10th Cir. 2001) (Eighth Amendment); *Collins v. Cundy*, 603 F.2d 825 (10th Cir.1979) (per curiam) (unclear which constitutional provision the plaintiff claimed was violated, but there is no discussion of disparate treatment or equal protection); *Moore v. Morris*, 116 F. App'x. 203 (10th Cir.2004) (unpublished) (Eighth Amendment); *Yarbrough v. City of Kingfisher*,

were to curse at someone during a traffic stop, that would not be enough to suggest the seizure was unreasonable under the Fourth Amendment. Likewise, it makes sense that verbal abuse typically cannot rise to the level of "cruel and unusual punishment" in violation of the Eighth Amendment. In the equal protection context, however, a distinction between "mere" verbal abuse and other forms of harm defies logic.[2] Whether a police officer berates a person because of their disability or does so while also handcuffing the person because of their disability, the motivation of the police officer and the harm to the victim is exactly the same. In both scenarios, the person was treated differently because of their disability, and in both scenarios, the person suffered emotional harm as a result of being treated differently than other arrestees who do not have disabilities. It would be arbitrary to deny the person relief in the first scenario but allow it in the second, and that is precisely the type of disparity the Equal Protection Clause was designed to avoid. *See Engquist*

---

153 F.3d 730 (10th Cir. Jul.14, 1998) (unpublished) (unclear which constitutional provision the plaintiff claimed was violated, but it cites *Collins* in support, and there is no discussion of either equal protection or disparate treatment); *Williams v. Levansailor*, 153 F.3d 730, 1998 WL 426865 (10th Cir. Jul. 21, 1998) (unpublished) (court expressly refused to consider disparate treatment claim because it was raised for the first time on appeal); *Harris v. Rocchio*, 132 F.3d 42, 1997 WL 787185, *3 (10th Cir. Dec. 24, 1997) (unpublished) (Eighth Amendment); *Buford v. Leck*, 991 F.2d 805, 1993 WL 125412 (10th Cir. Apr. 20, 1993) (unpublished) (While it is unclear which constitutional provision the plaintiff claimed was violated, but there is no discussion of equal protection or disparate treatment. Also, the opinion expressly states "This order and judgment has no precedential value and *shall not be cited*, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel."); and *Patton v. Przybylski*, 822 F.2d 697 (7th Cir. 1987) (This case deals with the Due Process Clause, not the Equal Protection Clause, and the plaintiff did not even allege that the racially derogatory remarks violated his rights.); *Taylor v. City of Bixby*, Okla., No. 12-CV-0066-CVEFHM, 2012 WL 6115051 (N.D. Okla. Dec. 10, 2012) (Eighth Amendment); and *Rivera v. Garfield Cnty. Sheriff's Dep't*, No. CIV-15-1299-M, 2015 WL 10015375, at *5 (W.D. Okla. Dec. 14, 2015), report and recommendation adopted, No. CIV-15-1299-M, 2016 WL 540811 (W.D. Okla. Feb. 9, 2016) (The court in this case expressly noted "It is not clear what provision of the Constitution Plaintiff believes was violated by these allegations," and explained that while verbal harassment *typically* does not rise to the level of a constitutional violation, it can if it "create[ed] extreme psychological distress." There is no discussion of equal protection or disparate treatment.).

[2] Notably, Defendant Carrocia has not cited to a single published case holding that verbal abuse cannot form the basis of a claim of disparate treatment in violation of the Equal Protection Clause.

*v. Oregon Dept. of "Agriculture*, No. 07-474, slip op. at 5 (U.S. Jun. 9, 2008) (noting the Equal Protection Clause is "a shield against arbitrary classifications").

Plaintiff's equal protection claim is not for mere verbal abuse, but for disparate treatment, and the facts she has alleged in her Petition are more than enough to make it plausible that Defendant Carrocia violated her equal protection rights. As such, the Court should deny Defendant Carrocia's motion and allow the claim to proceed.

## II.   PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS MUST NOT BE DISMISSED BECAUSE REASONABLE PEOPLE COULD FIND CARROCIA'S CONDUCT WAS EXTREME AND OUTRAGEOUS.

Defendant Carrocia argues she cannot be held liable for Intentional Infliction of Emotional Distress ("IIED") because, she submits, her conduct was not "extreme" and "outrageous" but only amounted to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Plaintiff—and, notably, thousands of other people—vehemently disagree.

Calling someone "crazy" or "a basket case" or similar names, and even mocking or taunting them, is *usually* not something that would fall within the ambit of a viable IIED claim. However, importantly, whether the conduct claimed to have amounted to IIED is sufficiently extreme and outrageous to form the basis of such a claim "must be considered in the setting in which the conduct occurred." *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986). In *Eddy*, the Oklahoma Supreme Court noted, "The outrageous and extreme nature of the conduct to be examined should not be considered in a sterile setting, detached from the milieu in which it took place." *Id.* The Court went on to illustrate:

> The salon of Madame Pompadour is not to be likened to the rough-and-tumble atmosphere of the American oil refinery. There is a difference between violent and vile profanity addressed to a lady, and the same language to a Butte miner and a United States Marine.

6

*Id.* What Defendant Carrocia characterizes as mere petty insults and trivialities—mocking, taunting, harassing, threatening, and ridiculing a mentally ill elderly woman on the basis of her disability—occurred in a setting in which Ms. Paris was suffering from a mental health crisis of which Defendant Carrocia was well aware. It occurred while Defendant Carrocia was exercising authority over Ms. Paris and had her in her custody, such that Ms. Paris could not have simply removed herself from the situation to avoid being subjected to such torment. It occurred while Defendant Carrocia was on the clock as a police officer, whose job is to protect and serve her community, and who has a constitutional duty to seek medical care for those in her custody who have a serious medical need—such as a mental health crisis. It occurred after Ms. Paris had expressed her fear that the police were trying to kill her. It even occurred after Ms. Paris had apologized to Defendants Carrocia and Root, and while Ms. Paris was being nothing short of respectful—even pleasant—to Defendant Carrocia and the other defendant officers.

At this stage in the litigation, the Court is not tasked with deciding whether Defendant Carrocia's conduct was sufficiently extreme or outrageous for Ms. Paris to prevail on an IIED claim; rather, its job is to determine whether reasonable people could hold differing opinions about whether Defendant Carrocia's conduct was extreme and outrageous. *See Eddy*, 715 P.2d at 76-77. A successful IIED claim "is one where 'the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'" *Trentadue v. United States*, 386 F.3d 1322, 1336 (10th Cir. 2004) (applying Oklahoma law).

That is exactly what happened when the public learned of how Defendant Carrocia treated Ms. Paris. Body-worn camera footage of Defendant Carrocia's conduct toward Ms. Paris went "viral" in March 2022. Just one video of her conduct posted to YouTube has received over ***67,000***

*views* (counted as of July 18, 2022).[3] YouTube flagged the video as "inappropriate for some users."[4] Among the 439 comments on the video (also counted as of July 18, 2022), are statements calling Defendant Carrocia's conduct "appalling," "despicable," "disgusting," "disturbing," "unbelievable," "shocking," "sickening," "reprehensible," "callous," "insidious," "brutal," "sadistic," "grotesque," "f[***]ed up," "sociopathic," and "disgraceful."[5] Each of these words is either synonymous with or otherwise akin to the word "outrageous,"[6] but just to be clear, one commenter even expressly stated, "I am outraged!!"[7]



> **Goodforyouman** 3 months ago (edited)
> Zero compassion! Zero empathy! Cold and heartless! These thugs need to be fired and stripped of any right of ever being in public service again! They need to be arrested for assault!! I won't even insult pigs by calling them pigs! They are losers and the worst kind of criminals. My heart breaks for LaDonna and her family that has to live with what happened to her by the hands of the ones who took an oath to protect and to serve!! I am outraged!! 😡 😡 😡
>
> 👍 1   👎        REPLY

Additionally, an online petition to Defendant Bynum demanding that he fire Defendant Carrocia for her abhorrent treatment of Ms. Paris, which was circulated after the body-worn camera footage went viral, has garnered over ***4,000 signatures***.[8] For more than a week after TPD released video footage of the incident along with a formal statement condoning Defendant Carrocia's behavior, its social media pages were flooded with complaints from constituents about how Defendant Carrocia treated Ms. Paris, even in the comments of posts that were wholly unrelated

---

[3] *See* Chris Williams, LADONNA PARIS TULSA PD ARREST VIDEO, YOUTUBE.COM (Mar. 30, 2022), https://www.youtube.com/watch?v=t16uCMhjPnE.

[4] *Id.*

[5] *See* Comments, Chris Williams, LADONNA PARIS TULSA PD ARREST VIDEO, YOUTUBE.COM (Mar. 30, 2022), https://www.youtube.com/watch?v=t16uCMhjPnE (printout filed herewith as **Exhibit 1**).

[6] *See* Outrageous, Thesaurus.com (last visited Jul. 18, 2022 11:51 A.M. C.S.T.), https://www.thesaurus.com/browse/outrageous.

[7] The comment is cut off on the printout (Ex. 1), but it can be viewed in full by going to the URL: https://www.youtube.com/watch?v=t16uCMhjPnE.

[8] Petition, *Demand that Tulsa Mayor G.T. Bynum Fire Tulsa Police Department Officer Ronni Carrocia!*, ACTIONNETWORK.ORG (last visited Jul. 18, 2022 2:18 P.M. C.S.T.), https://actionnetwork.org/petitions/demand-that-mayor-bynum-fire-tulsa-police-department-officer-ronni-carrocia/.

to the incident.[9] Even the City's own City Council Chairperson, Lori Decter Wright, condemned the behavior. In light of the public response to the video of the incident, it could not be clearer that reasonable people could—at a minimum—differ on whether Defendant Carrocia's behavior was extreme and outrageous to go beyond all possible bounds of civility. Ms. Paris has alleged more than enough to meet that standard and has even shown significant evidence that a reasonable person *would* find Defendant Carrocia's conduct extreme and outrageous. Accordingly, the Court must allow her to proceed with her IIED claim against Defendant Carrocia.

## III.    PLAINTIFF HAS STATED A CLAIM FOR ASSAULT.

Defendant Carrocia's final proposition is that Ms. Paris has not pleaded an injury resulting from the alleged assault (imminent apprehension of a harmful contact), because "a locked door separated Ms. Paris from the taser." Defendant Carrocia argues that in order to prove an assault, a plaintiff must show she "reasonably" believed she was about to be harmed [Def. Carrocia's Partial Mot. to Dismiss, p. 13], and that Ms. Paris could not have reasonably apprehended an immediate harmful contact because of the door that separated her from Defendant Carrocia's taser. To start, threatening Ms. Paris with the taser was intended to place her in imminent apprehension of a harmful contact. If Ms. Paris could not have reasonably apprehended an immediate contact, then it would have made little sense for Defendant Carrocia to make the threat in the first place in an attempt to draw Ms. Paris out of the bathroom.

However, even assuming *arguendo* that it is necessary for a plaintiff to plead sufficient facts to suggest her apprehension of an immediate harmful or offensive contact was reasonable, the actual issue of whether Ms. Paris could have reasonably apprehended an immediate harmful contact by Defendant Carrocia's taser is a question for a jury, not the court. In addition, while it is

---

[9] *See* Facebook Post printouts (filed herewith as **Exhibit 2**).

true that a locked door separated Ms. Paris from the taser, that does not mean Ms. Paris could not have reasonably apprehended an immediate harmful contact with her person. As Ms. Paris alleged in her Complaint, Defendant Carrocia threatened that she was "gonna kick this door down and rip [her] outta there." Compl. at ¶ 30. Ms. Paris also alleged and the video of the incident shows that is exactly what ultimately happened. Compl. at ¶ 34.

Significantly, Defendant Carrocia has not pointed to a single case suggesting that kicking down the door and tasing Ms. Paris could not have been sufficiently "immediate" for the apprehension of such contact to constitute the harm resulting from the assault. To the contrary:

> In this context . . . 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion . . . . [A]n assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of the term.

*People v. A.T.*, No. A145679, *8 (Cal. App. Jan. 10, 2017). Likewise, in *Longtin v. Pollard*, No. A-20-0200, *9 (Minn. App. Sept. 14, 2020), the Minnesota Court of Appeals, relying on the Restatement (Second) of Torts § 29 comment b (1965), explained, "'Imminent' does not mean there is a threat of instantaneous contact, only that there will be no significant delay." *See also State v. Daniels*, 11 P.3d 1114, 1117 (Idaho 2000) ("We do not think that the present ability . . . requires the instantaneous ability but rather indicates having opportunity coupled with all the necessary means prepared and immediately available for use."); *Vetter v. Morgan*, 913 P.2d 1200, 1204 (Kan. App. 1995) ("It is not necessary that the victim be placed in apprehension of instantaneous harm. It is sufficient if it appears there will be no significant delay.") (Citing Restatement (Second) of Torts § 29(1) comment b (1964)); *Dickens v. Puryear*, 276 S.E.2d 325, 331 (N.C. 1981) ("The apprehension created must be one of imminent contact, as distinguished from any contact in the future. 'Imminent' does not mean immediate, in the sense of instantaneous contact . . . . It means rather that there will be no significant delay.") (Quoting Restatement

(Second) of Torts § 29(1) comment (1965); *Holbert v. Noon*, 20 P.3d 836, 848 (Or. App. 2011) (quoting comment to Restatement (Second) of Torts § 29 (1965) and explaining, "It is not necessary that one shall be within striking distance of the other, or that a weapon pointed at the other shall be in a condition for instant discharge. *It is enough that one is so close to striking distance that he can reach the other almost at once, or that he can make the weapon ready for discharge in a very short interval of time.*" (Emphasis in original)).

Based on the facts pleaded in the Petition, Ms. Paris easily could have had a reasonable belief that Defendant Carrocia was about to kick the door down and tase her "without significant delay." Accordingly, she has pleaded sufficient facts to state a claim for assault, and Defendant Carrocia's motion to dismiss that claim should be denied.

## CONCLUSION

Ms. Paris' Petition makes clear that Defendant Carrocia intentionally abused Ms. Paris because of her disability. Whether that abuse was "merely" verbal or involved physical contact or some other type of treatment is irrelevant, because the discriminatory harm Ms. Paris faced was the same either way. The Petition also makes clear that Defendant Carrocia acted in a manner any reasonable person would find extreme and outrageous by intentionally caused Ms. Paris to suffer fear of being tased, and deliberately taunting Ms. Paris knowing she was suffering from a mental health crisis and fearful of the police and while Ms. Paris was in her custody. Finally, the Petition demonstrates Ms. Paris reasonably could have apprehended an immediate harmful contact with her person by Defendant Carrocia's taser, even if the contact would not have been instantaneous.

WHEREFORE, premises considered, the Court should deny Defendant Carrocia's Partial Motion to Dismiss.

Respectfully submitted,


*/s/ Kymberli J. M. Heckenkemper*
Damario Solomon-Simmons, OBA No. 20340
Kymberli J.M. Heckenkemper, OBA No. 33524
**SOLOMONSIMMONSLAW, PLLC**
601 S. Boulder Ave., Ste. 600
Tulsa, Oklahoma 74119
(918) 551-8999 (telephone)
(918) 558-8039 (facsimile)
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com

J. Spencer Bryan, OBA No. 19419
Steven J. Terrill, OBA No. 20869
**BRYAN & TERRILL LAW, PLLC**
3015 E. Skelly Dr., Ste. 400
Tulsa, Oklahoma 74105
(918) 935-2777 (telephone)
(918) 935-2778 (facsimile)
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

***Attorneys for Plaintiff***

12